**Nancy PREWITT, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**No. 77A04–0304–CR–197.**

Court of Appeals of Indiana.

Dec. 13, 2004.

[redacted]

Monica Foster, Foster & Long–Sharp, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Judge.

This case illustrates what happens when the State engages in a pattern of withholding exculpatory and material evidence from a defendant prior to trial. Appellant-defendant Nancy Prewitt raises a number of alleged errors following her conviction for the Murder[1] of her husband, William Davies. In particular, Prewitt claims that the following errors occurred: (1) the State improperly withheld certain exculpatory evidence from Prewitt in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) statistical

---

1. Ind.Code § 35–42–1–1.

evidence regarding the probability that Davies committed suicide was improperly admitted into evidence; (3) blood spatter evidence was erroneously admitted; (4) a statement from a purported expert witness indicating that Prewitt's claim that she never heard a gunshot appeared suspicious was improperly admitted; (5) Davies's father's testimony that his son would never have committed suicide was improperly admitted; (6) an autopsy photograph depicting Davies's cracked skull was erroneously admitted into evidence because it was prejudicial and prevented Prewitt from receiving a fair trial; (7) that the evidence was insufficient; and, finally, (8) that she was improperly sentenced.

Concluding that the State improperly withheld material information from Prewitt prior to trial in violation of *Brady*, we reverse the judgment of the trial court on that basis. However, while we find that the evidence presented by the State was sufficient to support Prewitt's conviction, we also observe that other issues raised by Prewitt in this appeal cause us great concern in the event of a retrial. Specifically, we note that the admission of certain statistics into evidence amounted to harmless error in these circumstances, that Prewitt has waived her argument with respect to the blood spatter evidence, and that Dr. Kohr's testimony as to his difficulty in believing that Prewitt would not have heard the gunshot was not improperly admitted. We further observe that Davies's father's testimony was properly admitted and that the autopsy photograph was properly admitted. Finally, we conclude that the State's evidence was sufficient to support Prewitt's conviction so as not to bar a retrial under double jeopardy principles.[2]

## FACTS[3]

Prewitt and Davies were married in December 1995. At approximately 2:00 p.m. on January 15, 1997, the two went drinking at the Wooden Keg Bar and Grill in Sullivan County, where each of them drank four or five beers every hour. They eventually left the bar at approximately 9:30 p.m. According to Prewitt, Davies made sandwiches for both of them when they returned to the house. Davies became angered because Prewitt did not eat hers, and she suffered a split lip as Davies attempted to stuff food into her mouth. Prewitt then went to bed, hoping that the situation would be better in the morning. However, Davies then allegedly pulled her from the bed, forced her into the bathroom and stuck her head under running water. Everything then went "black," and the next thing that Prewitt remembers is waking up and noticing that the clock near the bed read "eleven-something." She then went back to sleep, assuming that Davies was "sleeping it off" somewhere else. Tr. p. 479.

Prewitt then awoke at 2:00 a.m. when she had to use the bathroom. She observed Davies on the bathroom floor and saw some blood. She unsuccessfully tried to awaken Davies. Sometime during the early morning hours of January 16, 1997, Prewitt called 911 and reported that Davies had been shot. When the police arrived at the scene, they found Davies slumped on the floor against the bathroom vanity that was close to the doorway in the

---

2. Inasmuch as we are reversing Prewitt's conviction, we do not address her claim that she was improperly sentenced.

3. This court heard oral argument in Indianapolis on November 17, 2004 in the Indiana Supreme Court chambers. Present at the argument were a number of students from Carmel High School. We appreciate counsel for their able presentations in the presence of so many who were witnessing our appellate process for the first time.

master bedroom. Davies was dead, and it was determined that he had died from a single non-contact gunshot wound to the middle of his forehead.

It was established that while Davies owned a number of guns, it was Prewitt's .380 caliber pistol with which he was killed. The gun was found between Davies's legs. That particular pistol has a safety grip and a thumb safety, both of which had to be depressed before the gun would fire. When the investigation ensued, blood was found on the backs of Davies's hands and wrists; however, there was no blood on the inside of his hands or wrists. Moreover, no gunshot residue testing was done on either Davies's or Prewitt's hands. Neither the weapon nor the shell casings were fingerprinted, as those tests were "just never requested." Tr. p. 531. The police acknowledged that all of Davies's guns had been recently cleaned and, had prints been recovered, they "could be [real important]." Tr. p. 581. Prewitt made a statement to the police that she had been sleeping in the bedroom and had not heard a gunshot.

Five years later, on January 18, 2002, a grand jury indicted Prewitt for Davies's murder, and a jury trial commenced on December 2, 2002. At the trial, forensic pathologist Dr. Roland Kohr testified that Davies's death was a homicide. In reaching that conclusion, Dr. Kohr noted that the fatal gunshot wound was a non-contact wound to the forehead. Dr. Kohr then determined that based upon "a purely statistical basis," the odds were "greater than ninety-nine percent" that Davies's death was not a suicide. Tr. p. 419, 425.

At the trial, the prosecutor informed the jury that the State's case would be centered around blood spatter testimony from multiple experts, and the critical blood evidence concerned a red Indiana University sweatshirt that was seized from Prewitt on the night of the shooting. The State contended that Prewitt had been wearing the sweatshirt at the time Davies was shot, and that Davies's blood was on it because Prewitt had shot him at close range. Prewitt, however, alleged that she had been wearing the sweatshirt earlier in the day, that she had removed it at some point during the evening, and then put it back on after she found Davies's body so she would be clothed when the police arrived. Prewitt also contended that the sweatshirt became bloodstained when it was lying on the bathroom floor. In the end, however, serological tests revealed that various cuttings that had been taken from the sweatshirt did not contain blood.

Following the conclusion of the jury trial on December 6, 2002, Prewitt was found guilty of Davies's murder, and the trial court set a sentencing hearing for January 3, 2003. On December 30, 2002, Prewitt requested a continuance on the ground that she had "recently learned of new evidence." Appellant's App. p. 180. Prewitt then took the deposition of Indiana State Trooper Michael Eslinger, and Prewitt requested another continuance of her sentencing hearing on January 21, 2003, again alleging that she had discovered new and material evidence that had not been disclosed to defense counsel prior to trial.

The record reveals that the State had obtained statements from two witnesses who claimed that on the night that Davies was killed, Prewitt's son—Matthew Hunter—came to their window in the middle of the night and exclaimed that if "something happened" he was going to run away to California. It was not contested at trial that Hunter had been at the scene of the shooting at approximately 11:30 p.m. Hunter was at the Wooden Keg prior to Davies's death, and he returned to the bar at approximately 1:00 a.m. Kevin Cornwell

was Hunter's companion at the Wooden Keg, and he took him home that evening.

These witnesses reported to the police that the day after Davies's death, they noticed a trail of blood from the window where Matthew had been that led to the Wooden Keg. This information was not provided to Prewitt prior to trial, and the lead detective in the case had denied its existence in the pretrial depositions. And when the witnesses were interviewed by Prewitt's counsel prior to trial, they related a different and much less exculpatory version of the events.

The State also did not provide information to Prewitt that Rodney Cullison learned that Hunter and Cornwell had moved Davies's body on the night of the shooting. Evidence at trial established that Hunter and Cornwell were together that night and that they were at Hunter's house around the time that Davies had died. Cullison also told the police that, prior to Davies's death, Hunter asked him to beat Davies in return for drugs and money.

Prewitt's motion for continuance was denied, and she was sentenced to forty-five years in prison on January 23, 2003. Thereafter, on January 30, 2003, Prewitt took the depositions of Detective Gary Hoskins, Jennifer and Chastity Swiger, Crystal Ladson, Derek Cullison and Rodney Cullison. Then, on August 29, 2003, Prewitt's appellate counsel requested a remand to the trial court for investigation, discovery, and possibly a hearing on the allegation that the State had suppressed exculpatory evidence. This court granted Prewitt's request on September 9, 2003. On November 10, 2003, Prewitt filed a request in the trial court for a *Brady* hearing to support her claims that the State had failed to disclose exculpatory evidence. Hearings were held in the trial court regarding Prewitt's suppression

claims on January 8 and January 12, 2004. The trial court denied Prewitt's *Brady* claims by order on January 20, 2004. This court then resumed jurisdiction, and the appeal ensued.

## DISCUSSION AND DECISION

### I. Withholding of Exculpatory Evidence

Prewitt contends that she is entitled to a new trial because the State improperly withheld certain evidence from her prior to trial in violation of the rules set forth in *Brady v. Maryland*. Prewitt asserts that the allegations concerning the suppression of evidence fall into the following categories: evidence that Hunter had blood on him the night Davies died; that Hunter had communicated an intent to flee to California if "something happened;" other statements that Hunter made to a number of witnesses suggesting that Davies's death was not the result of a suicide; evidence that Hunter and Cornwell had moved Davies's body; and evidence that Hunter had previously offered money and drugs to another individual to beat up Davies.

■ At the outset, the State argues that Prewitt has waived these claims because she failed to follow the procedural steps for raising a *Brady* issue under Criminal Rule 16 and Trial Rules 59 and 61. *See Hubbell v. State*, 754 N.E.2d 884, 894 (Ind. 2001). Specifically, the State points out that an alleged *Brady* violation that comes to light after trial should be "raised by a motion for a new trial based on newly discovered evidence, or a motion to correct error" within thirty days of the final judgment, i.e., after the imposition of the sentence. *Id.*

The State asserts that all of the evidence that Prewitt relied upon to support her claims of newly discovered *Brady* evidence was known to her no later than January

30, 2003, after she had completed her depositions, which was only seven days following the entry of final judgment. The State further points out that Prewitt did not file a motion to correct error within thirty days of the judgment, as required by Criminal Rule 16 and Trial Rule 59. Instead, Prewitt filed a Notice of Appeal on February 10, 2003. Although this court granted Prewitt's motion to stay her appeal and remand to the trial court for further discovery and an evidentiary hearing on the *Brady* claim in September 2003, the State urges that such a ruling should not "undo" the effect of the waiver.

In addressing this contention, we note that the defendant in *Hubbell* addressed his claim of suppressed evidence for the first time on appeal without initially presenting his contentions to the trial court. In rejecting Hubbell's claims, our supreme court commented on the requirement that a defendant should first file a motion to correct error when considering the applicability of Criminal Rule 16:

> Requiring a defendant to file a motion to correct error gives the trial court an opportunity to rule on the issue and may avoid an unnecessary appeal. Hubbell's attempt to raise the issue on appeal without trial court review, and without a hearing in the trial court, puts the appellate court in the unenviable position of attempting to weigh credibility on an undeveloped paper record. This is a task for the trial court. The trial judge has the benefit of a detailed understanding of other evidence in the case and can best assess any potential prejudice as well as weigh the credibility of claims of new evidence.

*Id.* at 894.

Here, Prewitt's appellate counsel sought a remand of this case after an appearance was entered. At that time, counsel raised the *Hubbell* concerns and acknowledged that the record—as it then existed—did not support the raising of a *Brady* claim on appeal, inasmuch as a hearing in the trial court was required. The order on remand was for the purpose of conducting further investigation, discovery, and presentation of argument and evidence to the trial court. And, while the record does not reflect the additional investigation that was necessary prior to presenting the claim, it does establish that discovery was sought and obtained. Appellant's App. p. 323, 326, 340, 341. Following a hearing, the trial court ruled on the claim and issued detailed findings of fact and conclusions of law. Thus, it is our view that all of the concerns set forth in *Hubbell* have been satisfied by Prewitt's use of Appellate Rule 37 to secure a remand. Just as compelling, we note that the State conceded at oral argument that the post-trial hearing would not have been conducted any differently had Prewitt first filed a motion to correct error. For these reasons, we conclude that Prewitt has not waived the issue regarding exculpatory evidence.

■ Hence, we go on to note that this court has determined that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution. *Badelle v. State*, 754 N.E.2d 510, 526 (Ind. Ct.App.2001), *trans. denied* (quoting *Brady*, 373 U.S. at 87, 83 S.Ct. 1194). To prevail on a *Brady* claim, a defendant must establish: (1) that the evidence at issue is favorable to the accused, because it is either exculpatory or impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that the evidence was material to an issue at trial. *Id.*

Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.* A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* Evidence cannot be regarded as "suppressed" and the State will not be found to have suppressed material information when the defendant has access to the evidence before trial by the exercise of reasonable diligence. *Id.* at 527. However, "[w]hen police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight." *Banks v. Dretke,* 540 U.S. 668, 124 S.Ct. 1256, 1263, 157 L.Ed.2d 1166 (2004). So, the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

### A. Evidence Regarding Statements Made By Hunter

The record reflects that at the time of Davies's death, Hunter was residing with Davies and Prewitt. As noted in the *FACTS,* it was not disputed that Hunter had been at the scene of the shooting at approximately 11:30 p.m. Tr. p. 569. It was further established that Hunter was at the Wooden Keg prior to Davies's death, and he returned to the bar at approximately 1:00 a.m. Tr. p. 242–44. Cornwell, who was Hunter's companion at the Wooden Keg, took him home that night. Tr. p. 244.

On April 18, 2002, the lead detective in this case—Gary Hoskins—met with several individuals, including Chastity Swiger.

Chastity reported to Detective Hoskins that one snowy night Hunter had come to her residence where he encountered Chastity's sister, Jennifer. Hunter allegedly told Jennifer that "if something happens that night, that he was going to California or someplace out of state." Appellant's App. p. 495. Although Chastity was unable to pinpoint the exact date that Hunter came to her house, she believed that his communication to Jennifer was somehow related to Davies's death. Chastity also allegedly told Detective Hoskins that there was a "trail of blood" from the window where Hunter had been that extended to the tavern.

Detective Hoskins verbally informed the prosecutor of the discussion he had with Chastity, as well as a similar conversation that Indiana State Police Trooper Michael Eslinger had with another individual—Crystal Ladson—who recounted the same story as Chastity. Prewitt maintains that no one informed her of these conversations, and that Detective Hoskins's notes regarding the interview with Chastity were not disclosed to Prewitt until after the trial had concluded. Moreover, Prewitt notes that Detective Hoskins testified during a deposition that no exculpatory evidence existed.

Prewitt claims that just before the trial commenced, she received a tip that Chastity, Jennifer and Crystal had spent the night together the evening that Davies was killed, that Hunter had visited the residence, and that there was a substance that appeared to be blood on his clothing or on the ground close to him. In light of this information, Don Campbell, an investigator for Prewitt, interviewed Chastity, whereupon she told Campbell that Hunter had come to the window late one night looking for Jennifer but that Chastity had informed him that Jennifer was sleeping, and he left. According to Chastity, this

was the only information that she had provided to the State Police. Jennifer told Campbell that she was present at a sleepover the night that Davies was shot. Jennifer also conveyed to Campbell that Hunter did not speak to anyone at the residence that evening, and that no one noticed anything unusual about Hunter or his clothing.

Additionally, just prior to trial, Rodney Cullison went to Trooper Eslinger's house, where he told Trooper Eslinger that he had heard that Hunter and a friend had moved Davies's body from the outside to the inside of the residence on the night of the death. Detective Hoskins then apparently told Trooper Eslinger that such evidence was inconsequential because Davies "died inside the house, was shot inside the house." Appellant's App. p. 649. The record shows that, among other things, Davies was discovered with his blue jeans "pulled down on his hips in a fashion that counsel thought would have been consistent with the body having been dragged by the shoulders backwards so that the pants would have been lower on the buttocks than they would normally have been." Tr. p. 46. There was also a towel that had been placed across Davies's arms following the shooting that no one could explain, which Prewitt's counsel thought might have been consistent with the body being moved. Finally, Prewitt's counsel believed that the location of the spent shell casing might have been consistent with the body being moved.

During Cullison's post-trial deposition, he testified that before Prewitt's trial, he told Deputy Eslinger that Hunter offered Cullison a "half ounce of crank and five hundred dollars to whip [Davies] up." Appellant's App. p. 467. Cullison stated that the conversation took place a couple of months prior to Davies's death. Cullison's son, Town Marshal Derek Cullison, testi-

fied after Prewitt's trial that Rodney had told him about the offer, and he immediately brought him to Trooper Eslinger to report that incident. Town Marshal Cullison did not participate in his father's interview with Trooper Eslinger. Trooper Eslinger ultimately denied that Cullison had told him about the offer to beat up Davies for drugs and money. Prewitt's counsel was aware that that Cullison had a "wild history of having been involved with at least the use of drugs." *Brady* Tr. p. 51. To be sure, Cullison had been in and out of drug rehabilitation programs, had been convicted of a number of crimes and had served time in various penitentiaries.

In light of these post-trial developments, Prewitt contends-among other things-that the trial court's determination that the "trail of blood" and the late evening visit to the girls' window were available to her "by the exercise of reasonable diligence" was erroneous. Prewitt points to *Boss v. Pierson,* 263 F.3d 734 (7th Cir.2001), where the State argued that certain suppressed evidence would have been available to the defendant had he exercised reasonable diligence, inasmuch as the suppressed evidence originated from a defense witness. The court rejected this contention and observed: "accepting the State's position would place a burden on defense counsel that goes far beyond what reasonable diligence demands." *Id.* at 741.

Along with *Boss,* we note that *Banks* was a more recent case decided by the United States Supreme Court, wherein the defendant alleged in a petition for postconviction relief that the prosecutor knowingly failed to turn over exculpatory evidence that would have revealed that another individual—Farr—acted as a police informant in the case. Banks further alleged that the State deliberately withheld information of a deal that prosecutors made with Cook, another witness, which

would have been critical to the jury's assessment of that witness's credibility. *Banks,* 124 S.Ct. at 1258. Banks was ultimately convicted of murder committed in the course of a robbery in violation of the Texas Penal Code,[4] and was subsequently sentenced to death.

More particularly, the facts giving rise to Banks's *Brady* claim are as follows: In a July 7, 1980, letter, the prosecution advised Banks's counsel that [the State] will, without necessity of motions, provide you with all discovery to which your are entitled.

Witnesses testified to seeing Banks and Whitehead together on April 11 in Whitehead's green Mustang and to hearing gunshots in Pocket Park at 4 a.m. on April 12.[5] Charles Cook testified that Banks arrived in Dallas in a green Mustang at about 8:15 a.m. on April 12, and stayed with Cook until April 14. Cook gave the following account of Banks's visit. On the morning of his arrival, Banks had blood on his leg and told Cook 'he [had] got into it on the highway with a white boy.' That night, Banks confessed to having 'kill[ed] the white boy for the hell of it and take[n] his car and come to Dallas.' During their ensuing conversation, Cook first noticed that '[Banks] had a pistol.' Two days later, Banks left Dallas by bus. The next day, Cook abandoned the Mustang in West Dallas and sold Banks's gun to a neighbor. Cook further testified that, shortly before the police arrived at his residence to question him, Banks had revisited him and requested the gun.

*On cross-examination, Cook three times represented that he had not talked to anyone about his testimony. In fact, however, Cook had at least one 'pretrial practice sessio[n]', at which Huff [the Deputy Sheriff] and prosecutors intensively coached Cook for his appearance on the stand at Banks's trial. The prosecution allowed Cook's misstatements to stand uncorrected. In its guilt-phase summation, the prosecution told the jury 'Cook brought you absolute truth.'*
Corroborating parts of Cook's account, Farr testified to traveling to Dallas with Banks to retrieve Banks's gun. On cross-examination, defense counsel asked Farr whether he had 'ever taken any money from some police officers,' or 'give[n] any police officers a statement.' Farr answered no to both questions; *he asserted emphatically that police officers had not promised him anything and that he had 'talked to no one about this [case]' until a few days before trial. These answers were untrue, but the State did not correct them. Farr was the paid informant who told Deputy Sheriff Huff that Banks would travel to Dallas in search of a gun.* In a 1999 affidavit, Farr explained:

'I assumed that if I did not help [Huff] with his investigation of Delma [Banks] that he would have me arrested for drug charges. That's why I agreed to help [Huff]. I was afraid that if I didn't help him, I would be arrested....

'Willie Huff asked me to help him find Delma's gun. I told [Huff] that he would have to pay me money right away for my help on the case. I think altogether he gave me about $200.00 for helping him. He paid me some of the money before I set Delma up. He paid me the rest after Delma was arrested and charged with murder....

'In order to help Willie Huff, I had to set Delma up. I told Delma that I

---

**4.** Tex. Penal Code Ann. § 19.03(a)(2) (1974).

**5.** *Banks v. State,* 643 S.W.2d 129, 131 (Tex. Crim.App.1982).

wanted to rob a pharmacy to get drugs and that I needed his gun to do it. I did not really plan to commit a robbery but I told Delma this so that he would give me his gun.... I convinced Delma to drive to Dallas with me to get the gun.'

*Banks,* 124 S.Ct. at 1264–65. At the penalty phase of Banks's trial:

> *On cross-examination, defense counsel twice asked whether Farr had told Deputy Sheriff Huff of the Dallas trip. The State remained silent as Farr twice perjuriously testified: 'No, I did not.'* Banks's counsel also inquired whether Farr had previously attempted to obtain prescription drugs by fraud, and, 'up tight over that,' would 'testify to anything anybody want[ed] to hear.' Farr first responded: 'Can you prove it?' Instructed by the court to answer defense counsel's questions, Farr again said: 'No, I did not....'
>
> Former Arkansas police officer Gary Owen testified that Farr as a police informant in Arkansas, had given false information; the prosecution impeached Owen by bringing out his pending application for employment by defense counsel's private investigator.
>
> Banks admitted striking Vetran Jefferson in April 1980, and traveling to Dallas to obtain a gun in late April 1980. He denied, however, any intent to participate in robberies, asserting that Farr alone had planned to commit them. The prosecution suggested on cross-examination that Banks had been willing 'to supply [Farr] the means and possible death weapon in an armed robbery case.'
>
> Urging Farr's credibility, the prosecution called the jury's attention to Farr's admission, at trial, that he used narcotics. Just as Farr had been truthful about his drug use, the prosecution suggested, he was also 'open and honest

with [the jury] in every way' in his penalty-phase testimony. Farr's testimony, the prosecution emphasized, was 'of the utmost significance' because it showed 'Banks is a danger to friends and strangers, alike.' Banks's effort to impeach Farr was ineffective, the prosecution further urged, because defense witness 'Kelley kn[ew] nothing about the murder,' and defense witness Owen 'wish[ed] to please his future employers.' *Id.* at 1266–67.

In response to Banks's petition for post-conviction relief where he claimed the *Brady* violation, the State responded that "nothing was kept secret from the defense." *Id.* at 1267. Although the State specifically asserted that the State had made "no deal with Cook," the State said nothing about Farr. *Id.*

During the course of post-trial discovery, one of the items that was turned over to Banks, pursuant to the court's order, was a seventy-four page transcript of an interrogation of Cook. The transcript revealed that the State's representatives had closely rehearsed Cook's testimony. Additionally, testifying at the evidentiary hearing, Deputy Sheriff Huff acknowledged, for the first time, that Farr was an informant and that he had been paid $200 for his involvement in the case.

In ultimately determining that Banks was entitled to present evidence in support of his *Brady* claims, and further deciding that Banks was entitled to a certificate of appealability as to the question of whether he adequately raised one of his other *Brady* claims, the United States Supreme Court observed:

> First, the State knew of, but kept back, Farr's arrangement with Deputy Sheriff Huff. Second, the State asserted, on the eve of trial, that it would disclose all *Brady* material. Third, ... Banks as-

serted that Farr was a police informant and Banks' arrest, a 'set-up.' In its answer, the State denied Banks's assertion. The State thereby 'confirmed' Banks's reliance on the prosecution's representation that it had fully disclosed all relevant information its file contained.... If it was reasonable for Banks to rely on the prosecution's full disclosure representation, it was also appropriate for Banks to assume that his prosecutors would not stoop to improper litigation conduct to advance prospects for gaining a conviction.

*Id.* at 1273–74 (citing *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). The court went on to note that:

Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady *material when the prosecution represents that all such material has been disclosed.* The State here nevertheless urges, in effect, that 'the prosecution can lie and conceal and the prisoner still has the burden to ... discover the evidence,' so long as the 'potential existence' of a prosecutorial misconduct claim might have been detected. A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process. 'Ordinarily, we presume that public officials have properly discharged their official duties.'

*Id.* at 1275 (quoting *Bracy v. Gramley,* 520 U.S. 899, 909, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) (emphasis added)). Additionally, it was pointed out that

Here, the State elected to call Farr as a witness. Indeed, he was a key witness at both guilt and punishment phases of Banks's capital trial. Farr's status as a paid informant was unquestionably 'relevant' similarly beyond doubt, disclosure

of Farr's status would have been helpful to [Banks's] defense. [No] decision of this Court suggests that the State can examine an informant at trial, withholding acknowledgment of his informant status in the hope that defendant will not catch on, so will make no disclosure motion.

. . .

As the State acknowledged at oral argument, Farr was 'paid for a critical role in the scenario that led to the indictment.' Farr's declaration, presented to the federal habeas court, asserts that Farr, not Banks, initiated the proposal to obtain a gun to facilitate the commission of robberies. Had Farr not instigated, upon Deputy Sheriff Huff's request, the Dallas excursion to fetch Banks's gun, the prosecution would have had slim, if any, evidence that Banks planned to 'continue' committing violent acts. Farr's admission of his instigating role, moreover, would have dampened the prosecution's zeal in urging the jury to bear in mind Banks's 'planning and acquisition of a gun to commit robbery,' or Banks's 'planned violence.' ... On the record before us, one could not plausibly deny the existence of the requisite 'reasonable probability of a different result' had the suppressed information been disclosed to the defense.

*Id.* at 1276–77 (quoting *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555).

■ In considering the disposition and rationale espoused in *Banks,* together with the facts and circumstances of this case, it is apparent that what Prewitt's defense counsel actually knew before trial was dramatically different—and far less exculpatory—than what the witnesses had, in fact, shared with the State prior to trial. When Prewitt's counsel heard rumors of Hunter's late night visit, her investigator made

an immediate effort to contact the witnesses. And, as the circumstances indicate, the police misrepresented whether they had spoken to these witnesses, and the prosecutor did nothing to correct those misrepresentations.

Here, the State argues that the evidence regarding Hunter was not credible because (1) Chastity and Crystal rendered accounts that were inconsistent with each other; (2) Jennifer, who apparently had the conversation with Hunter, consistently denied it; and (3) none of the three girls could say with certainty that Hunter's visit to the window happened the night that Davies was killed. Appellee's Br. p. 30. Contrary to this position, Detective Hoskins believed that Crystal and Chastity's statements were consistent. To be sure, he testified that he viewed Crystal's statement to Trooper Eslinger as "corroborat[ing]" the statement he had taken from Chastity. Appellant's App. p. 501. Detective Hoskins also acknowledged that Crystal told Officer Eslinger "basically the same thing Chastity had told me." Appellant's App. p. 501.

Evidence was also presented at trial establishing that Hunter went to the girls' window the night that Davies was shot. For instance, Chastity testified that she heard Hunter come to the window and say he "had to get out of town." Appellant's App. p. 558. On direct examination, she expressly stated that this was the evening that Davies was shot. Appellant's App. p. 559. Chastity also believed that the conversation at the window was with regard to Davies's death. Appellant's App. p. 496. She contacted the police because "it was on [her] conscience" and she "couldn't deal with it anymore." Appellant's App. p. 683. Jennifer testified that one night in January when they had a sleepover with Crystal, the following day her niece came over and

said that Davies had been shot the preceding evening. Appellant's App. p. 536.

In our view, the State's suppression of the evidence detailed above presented questions of the utmost importance at the trial about the manner, quality, and thoroughness of the investigation that led to Prewitt's arrest five years after Davies had been shot. And Prewitt could at least have used the suppressed evidence to show shortcomings in the investigation. Without the exculpatory evidence, Prewitt was locked in to a defense at trial that Davies had committed suicide. Had the *Brady* information described above been disclosed to Prewitt, she certainly could have made a claim that Hunter—or someone else—had been the shooter. That said, we cannot agree with the State's proposition that it should pay no penalty for suppressing the above evidence.

■ We must similarly reject the State's contention that Prewitt should or could have discovered the suppressed evidence through the exercise of due diligence because Prewitt may have been aware of Hunter's visit to the girls' residence. It is quite apparent to us that the State misled Prewitt under oath in the early stages of the investigation, and that misfeasance was never corrected. Detective Hoskins testified about the witnesses he had interviewed, and that list did not include Chastity Swiger or Crystal Ladsen. While Detective Hoskins acknowledged that he typically took notes regarding unhelpful information and that he had no such notes in the case, the post-trial evidence demonstrated otherwise. Moreover, Detective Hoskins erroneously testified that he was not aware of any exculpatory evidence. Defendant's *Brady* Ex. A, p. 33–34. And Prewitt justifiably relied upon these affirmative misrepresentations.

Additionally, even if Detective Hoskins forgot about the interview and the notes—

as he in fact claimed—the prosecutor was aware of the interviews, but similarly "forgot" that such evidence existed, and sat idly by without correcting the false testimony. Appellant's App. p. 498–99, 501; Defendant's *Brady* Ex. A, p. 16–17. In light of these circumstances, the State is in no position to fault the defense, inasmuch as it was the State that created the conditions that occurred here. *See Leka v. Portuondo,* 257 F.3d 89, 101 (2d Cir.2001) (reversing a murder conviction where the government disclosed *Brady* material three days prior to trial after misleading the defendant about this evidence during plea negotiations). Therefore, we can only conclude that the State's suppression of this evidence amounted to a *Brady* violation.

## B. Evidence Relating To Statements Made By Cullison

■ We now go on to address Prewitt's challenge to the trial court's finding that no *Brady* violation occurred in this case even though: (1) Cullison testified in his post-trial deposition that he told Trooper Eslinger about Hunter's offer to pay money and drugs to have Davies beaten; (2) Cullison told Trooper Eslinger that he had heard about Hunter and Cornwell moving Davies's body; (3) Rodney Cullison was brought to Deputy Eslinger's home by his son, who testified in a post-trial deposition that the reason he brought his father to Deputy Eslinger was because of the "money and drugs for battery" offer; and (4) Deputy Eslinger testified post-trial that he did not take notes of his conversation and "did not put much stock in anything [Cullison] said." Appellant's App. p. 653.

Prewitt argues that the evidence was "*Brady* material" and that she is entitled to a new trial because there is no question that defense counsel would have interviewed Cullison to find out what he knew. Had the State fulfilled its obligations under *Brady,* Prewitt contends that her trial counsel would have learned of the highly exculpatory evidence that Hunter was soliciting someone to beat up Davies. Cullison may very well have been the type of individual to solicit and batter another person for drugs and money in light of the substance abuse issues. But put quite simply, it was not for the prosecutor or Detective Hoskins to make a judgment regarding Cullison's credibility. Rather, it was for Prewitt's counsel to decide whether Cullison was helpful enough to be presented as a witness and for the jury to determine the issue of credibility. Similarly, although the trial court found against Prewitt on the claim of the battery solicitation, the evidence was covered by *Brady* because it would inevitably have been discovered had the State informed Prewitt of Cullison's report. Like the other material that was suppressed, the State's withholding of this evidence deprived Prewitt of the opportunity to investigate and possibly present Cullison's testimony at trial.

■ Finally, we address Prewitt's *Brady* claim as to the State's suppression of evidence regarding the purported testimony from Cullison that Davies's body had been moved from the outside to the inside the residence. Again, the record shows that Trooper Eslinger reported the information he had received from Cullison to Detective Hoskins. *Brady* Tr. p. 165. However, Detective Hoskins told Trooper Eslinger that it was "impossible because [Davies] died inside the house, was shot inside the house." Appellant's App. p. 649.

We reject the State's contention that the statement made by Cullison did not constitute suppressed "material" evidence. The question as to whether Davies's body had been moved was one that her defense counsel had entertained before trial. In particular, the photographs of Davies's

body "reflected lividity high on the back whereas in the photographs he is leaning in a fairly upright position against the bathroom counter, which should not have resulted in lividity in the upper portions of the back." *Brady* Tr. p. 44. A former Marion County homicide detective shared defense counsel's concerns with lividity. *Brady* Tr. p. 146. Again, the photographs taken at the crime scene demonstrated that the blue jeans that Davies had worn were "pulled down to his hips in a fashion that counsel thought would have been consistent with the body having been dragged by the shoulders backwards so that the pants would have been lower on the buttocks than they would normally have been." Br. Tr. p. 46. There was also a towel that had been placed across Davies's arms following the shooting that no one could explain, which Prewitt's counsel stated might have been consistent with the body being moved. Finally, defense counsel believed that the location of the spent shell casing may have been consistent with the body being moved. Br. Tr. p. 45. Also, discerning whether the body had been moved was rendered more difficult because no good photos were taken of the carpeting from the bedroom to the bathroom where the body was found and no luminol was placed on that carpet to determine if blood was present. Br. Tr. p. 44–45.

 Although the State's suppression of this evidence, when viewed in isolation or piecemeal, may not amount to reversible error under *Brady,* the above discussion regarding this evidence is just one more violation that undermines our faith in the verdict against Prewitt. *See Badelle,* 754 N.E.2d at 527. In other words, when viewing the suppressed and material evidence in totality, it is apparent that the State knew of—but kept back—significant exculpatory evidence from Prewitt, and it

failed "to set the record straight." *See Banks,* 124 S.Ct. at 1263. Just as in *Banks,* Prewitt was not obligated to scavenge for hints of undisclosed *Brady* material when the State represented to her that all such material had been disclosed. *See id.* at 1275. That said, we conclude that Prewitt has established that there was at least a "reasonable probability of a different result" in this case. *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555. Hence, we reverse the trial court's judgment in denying Prewitt's request for a new trial based upon her *Brady* claims.

## II. *Erroneously Admitted Expert Testimony*

We next address Prewitt's contention that the testimony of Dr. Kohr was erroneously admitted at trial. Specifically, Prewitt argues that Dr. Kohr's statistical determination that there was only a "4 in 10,000 chance" that a suicide would involve a forehead shot at intermediate range was not reliable because there "was no evidence that [Dr.] Kohr possessed knowledge or expertise in statistics." Appellant's Br. p. 8.

The record reflects that Prewitt filed a pretrial motion in limine seeking a preliminary ruling excluding "opinions solicited from the State's experts which might fall outside the scope of their specific expertise." Appellant's App. p. 77. This motion was denied, and Dr. Kohr was permitted to testify at trial that Davies's death was a homicide in light of his testimony that the odds were greater than ninety-nine percent that Davies's death was not a suicide.

 The decision to admit or exclude evidence lies within the trial court's sound discretion and is afforded great deference on appeal. *Pritchard v. State,* 810 N.E.2d 758, 760 (Ind.Ct.App.2004). We will not reverse that decision absent a showing of

manifest abuse of discretion that results in the denial of a fair trial. *Id.*

■ In accordance with Indiana Evidence Rule 702(b), expert scientific testimony is admissible only if reliability is demonstrated to the trial court. Subsection (a) of that rule requires "knowledge" that will "assist the trier of fact to understand the evidence or to determine a fact in issue." The rule "assigns to the trial court a gatekeeping function of ensuring that an expert witness' testimony both rests on a reliable foundation and is relevant to the task at hand." *Howerton v. Red Ribbon,* 715 N.E.2d 963, 966 (Ind.Ct. App.1999), *trans. denied.* In its entirety, Indiana Evidence Rule 702(a) and (b) provides:

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

In interpreting the above rule, this court recently reaffirmed the notion that an expert must be qualified by knowledge, skill, experience, training or education. *Messer v. Cerestar USA, Inc.,* 803 N.E.2d 1240, 1247 (Ind.Ct.App.2004), *trans. denied.* Additionally, an expert must have sufficient skill in his particular area of expertise before an opinion may be rendered in that area. *Armstrong v. Cerestar USA., Inc.,* 775 N.E.2d 360, 365 (Ind.Ct.App. 2002), *trans. denied.* Moreover, an expert in one field of expertise cannot offer opinions in other fields absent a requisite showing of competency in that other area. *Wallace v. State,* 553 N.E.2d 456, 463 (Ind. 1990).

■ We also note that the proponent of expert testimony bears the burden of establishing the foundation and reliability of the scientific principles and tests upon which the expert's testimony is based. *Hannan v. Pest Control Servs., Inc.,* 734 N.E.2d 674, 679 (Ind.Ct.App. 2000), *trans. denied* (citing *McGrew v. State,* 682 N.E.2d 1289, 1290 (Ind.1997)). And reliability may be established by judicial notice or, in its absence, by the one who seeks to offer the scientific testimony. The proponent of the evidence must provide a sufficient foundation that will convince the trial court that the relevant scientific principles are reliable. *Steward v. State,* 652 N.E.2d 490, 498 (Ind.1995).

Here, Prewitt claims that the trial court erred in admitting Dr. Kohr's testimony because the statistical calculations were outside the scope of his expertise and because he relied upon invalid mathematical calculations that produced unreliable results. She makes the point that there was no evidence regarding Dr. Kohr's expertise or specialized knowledge in statistics or their interpretation. To illustrate, Prewitt points to the "product rule" method that Dr. Kohr used at trial in producing the "4 in 10,000 figure." Appellant's Br. p. 16. This rule "states that the probability of the joint occurrence of a number of mutually independent events is equal to the product of the individual probabilities that each of the events will occur." *People v. Collins,* 68 Cal.2d 319, 325, 66 Cal.Rptr. 497, 438 P.2d 33 (Cal.1968). That is, the product rule predicts the probability of two variables occurring simultaneously by multiplying the known probability of one variable by the known probability of the other. *See id.*

Prewitt directs us to *Wilson v. Maryland*, 370 Md. 191, 803 A.2d 1034 (2002), where the trial court committed reversible error in admitting expert probability testimony concerning the likelihood of two separate infant deaths being related to SIDS, as opposed to homicide. The expert who testified in *Wilson* stated that the chances of two children in the same family dying of SIDS was 1 in 100,000,000. *Id.* at 1047. It was determined that this calculation—based upon the product rule—was erroneous because "a condition necessary to the proper application of the product rule was lacking: there was inadequate proof of the independence of [each of the children's] deaths." *Id.* at 210, 803 A.2d 1034.

Moreover, the court was not able to rule out the possibility that there was a genetic component to SIDS. Finally, the appellate court commented that because "lay jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials," the defendant was granted a new trial. *Id.* at 212, 803 A.2d 1034. Citing *Wilson*, Prewitt maintains that the State presented no evidence tending to show that the suicide variables it considered dispositive are independent of each other, and she further maintains that the use of the product rule in this case grossly under-inflated the statistical probability that Davies's death was a suicide. Put another way, Prewitt argues that the testimony that only 4 in 10,000 suicides are forehead wounds of intermediate range constitutes a grotesque exaggeration when the actual numbers are reviewed.

Prewitt also urges that Dr. Kohr's testimony should not have been admitted because there was no showing that the source of the statistics had been subjected to scientific testing, that the statistics and the methodology used to secure them had been subjected to peer review, or that

there is general acceptance of them in the scientific community. Inasmuch as there was no foundational basis for Dr. Kohr's opinions with regard to this issue, Prewitt argues that the admission of this evidence amounted to reversible error.

Finally, Prewitt maintains that the evidence offered by Dr. Kohr was "so lacking in probative value" that it was irrelevant. Appellant's Br. p. 22. Again, Prewitt asserts that Dr. Kohr's opinions were based on the presence of statistical probabilities of certain variables for which no foundation was offered and which were demonstrably false. Moreover, Prewitt posits that this evidence suggesting guilt was unfairly prejudicial. She notes that when unsubstantiated estimates are used in probability calculations, speculation is presented to the jury that is clothed in scientific accuracy. Thus, the prejudicial impact clearly outweighs any probative value of the evidence. *See Davis v. State*, 476 N.E.2d 127, 134 (Ind.Ct.App.1985); *trans. denied.*

 At the outset, we note that the State argues that Prewitt has waived this issue because she failed to raise these objections at trial. However, contrary to the State's contentions, Prewitt's counsel not only objected to the form of the question regarding Dr. Kohr's testimony, but the remainder of the objection was "I don't think this witness can say there's a 99% probability." Tr. p. 425. Inasmuch as Prewitt's argument focused on whether Dr. Kohr could state that there was a 99% probability that Davies's shooting was a homicide rather than a suicide, we find that Prewitt's objection was adequate and that she did not waive the issue.

 Proceeding to the merits of Prewitt's argument, it is apparent that her challenges to the validity of Dr. Kohr's statistical methodology, and specifically the use of the product rule, goes to the

weight of the evidence, not its admissibility. *See Smith v. State*, 702 N.E.2d 668, 673–74 (Ind.1998) (stating that a defendant's claim that the product rule was improperly applied because the genes were in linkage disequilibrium, and thus not independent, went to the weight and not the admissibility of the evidence). Additionally, Prewitt has not made a sufficient showing that Dr. Kohr's testimony was outside the scope of his expertise. Specifically, it was established at trial that Dr. Kohr is a forensic pathologist and a professor of criminology. Tr. p. 412–13. Part of the pathologist's task is to determine whether a particular death was a suicide or a homicide. Tr. p. 415. Moreover, the State asserts—and we agree—that Dr. Kohr was not required to explain the source of his statistics in order to make his testimony admissible. To be sure, an expert is permitted to testify to his opinion and the reasons therefore "without first testifying to the underlying facts or data." *See* Ind. Evidence Rule 705. Finally, we note that even if it can be said that the admission of Dr. Kohr's testimony was error, it was harmless at best. This court will not reverse a conviction based on the improper admission of evidence when harmless error results. *Edmond v. State*, 790 N.E.2d 141, 144 (Ind.Ct.App.2003), *trans. denied.* An error will be deemed harmless if the probable impact of the evidence upon the jury is sufficiently minor so as not to affect a party's substantial rights. *Id.* at 144–45.

Here, the location of the shot to the forehead was not the only factor that Dr. Kohr relied upon to conclude that Davies's death was a homicide. The evidence showed that Dr. Kohr relied upon several other factors, including the non-contact nature of the wound—which occurs in only 2–4% of suicides—Davies's high level of intoxication that would have made it difficult for him to have the motor control needed to inflict this injury, and the fact that

Prewitt had claimed not to have heard any gunshot even though she was approximately five feet away. In light of these factors, we cannot say that there was a reasonable likelihood that the opinion to which Dr. Kohr testified would have been different had it been based on data indicating that the percentage of gunshot suicides to the forehead was only a few percentage points higher.

Moreover, the State presented the trial testimony of a second forensic pathologist, Dr. Pless, who independently reviewed the evidence and also concluded that Davies's death was a homicide. Tr. p. 451–55. Dr. Pless did not rely on the location of the entry wound to the forehead either alone, or in conjunction with, the distance of the weapon. Tr. p. 454–55.

Because this second forensic pathologist testified that Davies's death was a homicide wholly apart from, and without relying on, the statistical evidence that Prewitt now challenges, any error in the admission of Dr. Kohl's testimony was at most, harmless error.

### III. *Erroneously Admitted Blood Spatter Evidence*

Prewitt next contends that expert testimony relating to blood spatter patterns was erroneously admitted at trial. Specifically, she maintains that the evidence was "irrelevant, did not assist the factfinder, confused the jury, and had no probative value." Appellant's Br. p. 24.

We note that Prewitt agrees that she did not object to this testimony at trial. As a result, the issue is waived. *See Haycraft v. State*, 760 N.E.2d 203, 211–12 (Ind.Ct.App.2001), *trans. denied* (recognizing that in order to preserve an issue for appeal, a defendant must make a contemporaneous objection, on the same grounds as those raised on appeal, at the time the evidence is elicited at trial). We similarly

conclude that this issue does not rise to the level of fundamental error, inasmuch as Prewitt has not demonstrated that the error was so prejudicial to her rights as to render a fair trial impossible. *See Clay v. State,* 766 N.E.2d 33, 36 (Ind.Ct.App. 2002).[6]

### IV. Opinion Evidence—Truthful Testimony Offered By Prewitt

 Prewitt next argues that the trial court improperly admitted the testimony of Dr. Kohr regarding his opinion as to the truthfulness of Prewitt's testimony. In particular, Prewitt claims that it was error to admit Dr. Kohr's testimony that he had a very difficult time believing that or understanding how Prewitt, who claimed to have been in a bed five to ten feet away from the incident, would not have heard the gunshot.

 This court has held that skilled witnesses—those with a degree of knowledge short of what is required to be an expert in the field but beyond that of an ordinary juror—may testify to opinions that are rationally based on the witness's perceptions and helpful to a clear understanding of the witness's testimony or the determination of a fact at issue. *Davis v. State,* 791 N.E.2d 266, 268 (Ind.Ct.App.

2003), *trans. denied.* Additionally, lay witnesses can offer opinion testimony so long as the opinion is rationally based on the perceptions of the witness and is helpful to a clear understanding of the witness's testimony or the determination of a fact at issue. *See* Evid. R. 701. However, it is improper to ask a witness whether he believed that another witness was truthful. *Bufkin v. State,* 700 N.E.2d 1147, 1150 (Ind.1998).

With respect to this issue, Dr. Kohr testified as follows:

> I had information provided to me by the police investigators at the time of the autopsy, was that this gun was discharged roughly five to ten feet away from the defendant, who, uh, was apparently sleeping in bed, or that's the story that was provided by initial scene investigations. *Although I'm not a firearms expert, I have been around weapons and know how much noise they make when they're discharged and I have a very difficult time believing or understanding that a gunshot in a bathroom where you have tiles, which would cause reverberation.*

Tr. p. 420 (emphasis added). Prewitt then lodged the following objection:

> Judge, I'm gonna object. Um, Dr. Kohr is basing his opinion upon an inaccurate

---

**6.** Although Prewitt has waived this issue, it is difficult to imagine that this issue will not again arise in the event of a retrial. During the trial, the experts for the State consistently referred to the stains found on the sweatshirt as "blood." The State's experts—and the prosecutor in his opening statement—identified the substance as blood. *See* tr. p. 210, 548, 601, 607–08, 638–39, 656–60. However, the additional evidence established at trial revealed that the State's serologist collected six cuttings from the sweatshirt that she believed were representative of the staining. Presumptive tests were performed that revealed negative results for blood on one of the cuttings. While presumptive tests conducted

on the remaining cuttings were positive for blood, additional "confirmatory" tests yielded negative results for blood. Moreover, luminol testing that was performed on the sweatshirt also yielded negative results for blood. Tr. p. 613. The State's expert explained that his assistant had incorrectly mixed the luminol solution that was used in performing the test. Tr. p. 613–14.

In light of the evidence that was presented, it is apparent that each expert simply "wrote off" the negative testing results, thereby indicating that neither expert was aware of the other's negative test results. Quite simply, the State cannot refer to the substance as "blood" when it is not blood.

assumption. And there's been no testimony as to whether this bathroom has tiles opposed to carpeting. I think those are incorrect facts and the State's not put into evidence what facts were actually given to Dr. Kohr. I think he's giving an opinion that's beyond his field of expertise as well.

Tr. p. 420. In light of the above, Prewitt maintains that Dr. Kohr's testimony was a direct attack upon her credibility that invades the province of the jury, which is prohibited by Indiana Evidence Rule 704(b).[7] Notwithstanding this claim, it is our view that Dr. Kohr's statement was offered in the context of explaining why he concluded that the manner of death was a homicide.

By way of illustration, while the State acknowledged that Dr. Kohr is not a firearms expert, he is a forensic pathologist and a professor of criminology. Thus, the State points out that "both of those fields require some knowledge of firearms and crime scene investigations that goes beyond the knowledge of most ordinary jurors." Appellee's Br. p. 31. As set forth above, Dr. Kohr testified that "I have been around weapons and know how much noise they make when they're discharged." Tr. p. 420. Hence, Dr. Kohr's opinion that it was unlikely that a person so close to the shooting would not be awakened by a gunshot occurring in a bathroom was based on his personal experience and perceptions of the noise made by a discharged firearm.

■ That said, we further note that Prewitt's argument is simply a challenge to the credibility or weight to be given to Dr. Kohr's opinion, which is for the jury to decide. It was, therefore, relevant for the jury to hear the reasons upon which Dr.

Kohr based his conclusion in order for the jury to weigh that evidence and determine whether it was persuasive. Hence, no error occurred with respect to this issue.

*V. Testimony of Davies's Father*

Prewitt next contends that the trial court erred in admitting certain testimony offered by Davies's father, George, that Davies would not have committed suicide. Specifically, Prewitt maintains that reversible error occurred when George opined that Davies "would never have considered killing himself." Tr. p. 225.

■ In support of this argument, Prewitt directs us to Indiana Evidence Rule 701:

If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Three factors must be shown before the admission of lay opinion testimony: (1) "the lay witness must set forth enough facts to allow the trial court to find, pursuant to Evidence Rule 104(a), that the opinion is based on the witness's personal perceptions," *Ackles v. Hartford Underwriters Ins. Corp.*, 699 N.E.2d 740, 743 (Ind.Ct. App.1998), *trans. denied*; (2) the opinion must be "rationally" based on the witness's perception, *Id.*; and (3) the opinion must be helpful to a clear understanding of the witness's testimony or to the determination of a fact in issue. *Id.*

In our view, George's opinion testimony above was based on his personal observations of his son. For instance, George

7. This rule provides as follows:
(b) Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions.

testified in detail as to where Davies lived and how long he had been employed in the years after he stopped living at home. Tr. p. 222–23. George also was aware that Davies's hobbies included reading, history, mechanics, hunting and fishing. Tr. p. 223–24. The evidence further established that George and Davies remained in contact, and that the two had a close relationship. Given these circumstances, we agree that the State established a sufficient foundation for the admission of George's opinion of his son's personality and whether he would consider suicide. It is thus apparent that George's opinion testimony was based upon his personal perceptions of Davies. Moreover, because Prewitt's theory of defense was suicide, the opinion of someone close to Davies as to whether he might contemplate suicide would assist the jury in coming to a decision regarding Prewitt's guilt or innocence. As a result, there was no error in the admission of George's testimony with respect to this issue.

### VI. Admission of Autopsy Photographs Into Evidence

Prewitt next argues that the trial court erroneously admitted an autopsy photograph into evidence. Specifically, Prewitt claims that the photograph of Davies's body was irrelevant, gruesome and "had no material value." Appellant's Br. p. 59.

 In resolving this issue, we note that the admission of photographic evidence is within the trial court's sound discretion and is reviewed only for an abuse of that discretion. *Helsley v. State,* 809 N.E.2d 292, 296 (Ind.2004). Even gory and revolting photographs may be admissible as long as they are relevant to some material issue or show scenes that a witness could describe orally. *Id.* Photographs that depict a victim's injuries are generally relevant and admissible. *Custis v. State,* 793 N.E.2d 1220, 1224 (Ind.Ct.

App.2003), *trans. denied.* Although autopsy photos are generally inadmissible if they show the body in an altered condition, they are nevertheless admissible where some alteration of the body is necessary to demonstrate the testimony being given. *Id.*

 In this case, the only autopsy photograph at issue here is State's exhibit 41– a picture of the inside of the top of a cracked, largely dry, non-bloodied skull bone. Dr. Kohr testified that this photograph shows the fracture lines emanating from the gunshot wound, and he explained that those fractures demonstrated the injury to the skull. Tr. p. 446–47.

From our review of the record, the photograph was relevant to explain Dr. Kohr's testimony regarding Davies's cause of death, and the photograph is not particularly gruesome. Hence, we conclude that the trial court did not err in admitting this exhibit into evidence.

### VII. Sufficiency of the Evidence

 Because we reverse on other grounds, we must go on to determine whether there is sufficient evidence upon which Prewitt can be retried. *See Lockhart v. Nelson,* 488 U.S. 33, 40, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988) (observing that a reviewing court must consider all of the evidence admitted by the trial court in deciding whether retrial is permissible under the Double Jeopardy Clause).

 In resolving this issue, we initially observe that this court will affirm a defendant's conviction if, considering only the probative evidence and reasonable inferences supporting the trial court's judgment, and without weighing evidence or assessing witness credibility, a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. *Rogers v. State,* 741 N.E.2d 395, 396 (Ind. Ct.App.2000), *trans. denied.* When a con-

viction is based on circumstantial evidence, this court will not disturb the verdict if the fact finder could reasonably infer from the evidence presented that the defendant is guilty beyond a reasonable doubt. *Jones v. State,* 783 N.E.2d 1132, 1139 (Ind.2003); *Hawkins v. State,* 794 N.E.2d 1158, 1164 (Ind.Ct.App.2003). Additionally, the circumstantial evidence need not overcome every reasonable hypothesis of innocence; the evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Hawkins,* 794 N.E.2d at 1164. Inconsistencies in the evidence are for the jury to evaluate, and to determine what evidence to believe. *Miller v. State,* 770 N.E.2d 763, 774–75 (Ind.2002).

In this case, we note that Prewitt does not dispute that the State proved the elements of the crimes charged beyond a reasonable doubt. Rather, she argues that she was not the perpetrator of the offenses, and the evidence offered by the State failed to prove the same. In essence, Prewitt argues that the alleged inadmissible evidence-the statistical probability evidence offered by Dr. Kohr as well as the blood spatter testimony-bore no probative value whatsoever. Appellant's Br. p. 34. That said, Prewitt maintains that all "we are left with is a case where charges were brought five years after the decedent's death, [and] at best, the State's evidence consists of a defendant who was present at the time her husband was killed." Appellant's Br. p. 34.

Notwithstanding Prewitt's claim, the State presented testimony from two forensic pathologists that the manner of death was homicide rather than suicide. Tr. p. 415–21, 425–26, 452–55. Moreover, Prewitt had both the motive and the opportunity to commit the crime. In light of all the evidence that was properly before the jury, the record does not support the contention advanced by Prewitt that she could not

have committed the crime. Thus, in considering such evidence, and applying our well-known standard of review, we cannot conclude that no reasonable jury could have found guilt beyond a reasonable doubt. We therefore reject Prewitt's contention that the evidence was insufficient to convict, and she may be retried.

*CONCLUSION*

In light of our discussion of the issues set forth above, we conclude that the State's suppression and withholding of the *Brady* material from Prewitt before trial amounts to reversible error. We similarly note that Dr. Kohr's testimony relating to the statistical probability that Davies committed suicide amounted—at most—to harmless error, that Prewitt has waived the argument that the testimony regarding blood spatter evidence was erroneously admitted and that Dr. Kohr properly testified that he had a difficult time believing that Prewitt would not have heard the gunshot under the circumstances. George Davies's testimony was also properly admitted as to whether his son had the propensity to commit suicide, and the admission of the autopsy photograph into evidence was not error. Finally, we conclude that the State presented sufficient evidence to support Prewitt's conviction, thus allowing a retrial by the State.

Reversed and remanded.

FRIEDLANDER, J., and ROBB, J., concur.