## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Jun 02 2015, 9:57 am

CLERK
of the supreme court,
court of appeals and
tax court

---

ATTORNEY FOR APPELLANT

Matthew D. Anglemeyer
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Katherine Modesitt Cooper
Deputy Attorney General
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

**M.S.,**

*Appellant-Respondent,*

v.

**State of Indiana,**

*Appellee-Petitioner,*

June 2, 2015

Court of Appeals Case No.
49A02-1403-JV-184

Appeal from the Marion Superior Court
The Honorable Scott Stowers, Magistrate
Case No. 49D09-1312-JD-3744
Case No. 49D09-1305-JD-1513

**Robb, Judge.**

## Case Summary and Issues

[1] Following a fact-finding hearing, M.S. was adjudicated a delinquent child for committing robbery, a Class C felony if committed by an adult. He raises two

issues for our review, which we restate as follows: 1) whether there was sufficient evidence to support his adjudication; and 2) whether the State committed a *Brady* violation by failing to disclose certain evidence. Concluding the evidence was sufficient and there was no *Brady* violation, we affirm.

## Facts and Procedural History

[2] In December of 2013, M.S., fifteen years old, and D.W., fourteen years old, were both students at Northwest High School in Indianapolis. After school hours on December 4, 2013, a group of students including both boys left the school campus to go to a nearby gas station to purchase snacks. On the way, they encountered L.D., a seventh grader, standing on the corner waiting to cross the street. M.S. told L.D. to give him his money or M.S. would punch him in the face. After some pushing and shoving, L.D. handed over his wallet containing $28.

[3] Indianapolis Public Schools Police Department ("IPSPD") Officer Dallas Gaines saw M.S. and D.W. return to the school campus at the same time. Subsequently, L.D. approached Officer Gaines and reported that two kids had just taken his wallet. Officer Gaines recognized the kids L.D. described as M.S. and D.W. The following day, IPSPD Officer Percy Johnson investigated the incident.

[4] Based on that investigation, the State filed petitions alleging both M.S. and D.W. were delinquent for committing robbery, a Class C felony if committed

by an adult. M.S. denied the allegations of the petition and his case was set for a fact-finding hearing in February 2014. D.W. entered into an admission agreement with the State in January 2014. Pursuant to his admission agreement, D.W. would admit to two added counts, battery and criminal conversion, both Class A misdemeanors if committed by an adult, and the State would dismiss the robbery count. D.W. also agreed to testify at M.S.'s fact-finding hearing. During D.W.'s admission hearing, the following factual basis was established:

> [Defense counsel]: . . . [A]t that point uh another individual uh who was who was [sic] there and you were with that individual and he turned around he uh demanded from [L.D.] or from an individual who was there, he demanded uh his money is that right? His money or his wallet or whatever?
>
> A: Yes, sir.
>
> [Defense counsel]: And um, in the course, in fact then you did nothing at that point to um stop that incident from happening. You did nothing to extricate yourself from that situation and in fact there were twenty-eight dollars that were taken is that right?
>
> A: Yes.
>
> [Defense counsel]: Okay which was split between the two of you right?
>
> A: No.
>
> The Court: I didn't hear your answer.
>
> [Defense counsel]: His answer was no. But you knew that money was taken is that right?
>
> A: Yes.
>
> [Defense counsel]: Uh and again you did nothing to remedy the situation, keep the situation from happening, you knew what was going down is that right?
>
> A: No.

[Defense counsel]: You didn't know that the kid had just, that someone had just demanded that?

A: Wait are you saying that . . .

[Defense counsel]: I am saying, okay let me rephrase that. When you got to the corner you knew that [M.S.] . . . took the money from uh this individual is that right?

A: Yes, sir.

* * *

[Defense counsel]: And you didn't have the permission of the individual to take that money, either you or [M.S.] . . . didn't have that permission is that right?

A: Yes, sir.

* * *

State: Okay and in the course of your interaction with [L.D.] was he touched in a rude, insolent or angry manner?

A: Yes, cause there was like a lot of pushing and shoving and . . . it like happened real fast so you couldn't really tell but I saw like pushing going on and stuff like that.

[Defense counsel]: And you were involved in that, is that right?

A: No.

[Defense counsel]: Well did you, I am just telling you what you told me.

A: Yes.

State: You were involved in that.

A: Yes.

State: And it was reasonable to believe that [L.D.] experienced pain or injury from that pushing?

[Defense counsel]: That you hit him hard enough that it would have hurt him. If he said it hurt him that you were, that could have happened, is that right?

A: Yes.

State: Yes. And did you receive any of the money that was taken?

A: No.

State: Okay, but you were involved in the pushing when his money was taken?

A: Yes.

State: Okay. And the other individual that you were with that was [M.S.]?

* * *

A: Yes, ma'am.

State: Um, at that time did you hear [M.S.] say anything to the individual who the money was taken from?

A: Yes, he was like give me your money or I am going to hit you in the face.

Defense Exhibit A at 9-12.[1] The juvenile court found a sufficient factual basis for D.W.'s admission and entered a true finding of battery and criminal conversion.

[5]    At M.S.'s fact-finding hearing, held approximately three weeks after D.W.'s admission hearing, D.W. testified that on the afternoon of December 4, 2013, he had stayed after school for tutoring. His tutoring was cancelled, so he went to the gym to watch basketball practice. With the permission of one of the school police officers, he left the school to go across the street to a gas station to buy a snack. He and several other students, including M.S., encountered L.D.

---

[1] After filing his Notice of Appeal, M.S. requested this court temporarily stay the appeal to allow him "to go back to the [juvenile] court to enter the transcript [of D.W.'s admission hearing] into evidence so that the issues of D.W.'s incredibly dubious testimony and the State's not disclosing D.W.'s prior contradicting statement is part of the record and may be argued on appeal." Supplemental Appellants Appendix at 10. This court granted the motion and ordered the juvenile court to hold a hearing on M.S.'s request to enter D.W.'s admission hearing transcript into evidence. *Id.* at 12. At the hearing, the juvenile court accepted the transcript into evidence and it became part of the record of this appeal. *Id.* at 18.

at the corner. M.S. told L.D. to "give me your stuff or I'll punch you in your mouth." Transcript at 12. L.D., who appeared nervous, pulled out his wallet and gave M.S. his money. D.W. testified he and M.S. then went their separate ways – D.W. continued to the gas station and he did not see M.S. after he returned to the school. D.W. acknowledged he had entered into an admission agreement that required him to testify at M.S.'s hearing.

[6]     On cross-examination, M.S.'s counsel inquired:

> Q: [D.W.], so what did you do exactly to [L.D.]?
>
> A: [L.D.]? I didn't do nothing. They was like a lot of talking . . .
>
> Q: So, so wait you are saying you didn't do anything physically to [L.D.]?
>
> A. No.
>
> Q: You didn't do anything with his money?
>
> A: No.
>
> * * *
>
> Q: Well that's interesting because the Prosecutor here just mentioned, reminded you of the Plea Agreement you did in this case, correct?
>
> A: Yes, sir.
>
> Q: And on January 16th you admitted to Battery against [L.D.] correct?
>
> A: Yes, sir.
>
> Q: So what did you admit to doing against [L.D.]?
>
> * * *
>
> A: I aint [sic] touch him at all. It was just like I don't know I just wanted to take the plea so I could hurry up and get done with this. I got things like to do. So I really didn't try to . . .
>
> Q: So you are saying that you didn't admit to doing anything physical to [L.D.]?

A:  I admit that I was there . . . and I was talking to him.

* * *

Q:  Okay so on [January] 16th you are telling us that after taking an oath and swearing to tell the truth you lied by saying that you committed Battery and Conversion against [L.D.] when you really didn't? . . . Because you just wanted this to be over right?

A:  Yes, sir.

Q:  And part of that plea agreement was agreeing to testify against [M.S.] saying that he did this to [L.D.] correct? . . . And did you also agree to that because you just want this to be over?

A:  No, he that's what really happened.

Q:  Okay.  Well the thing is what you are saying today is different than from what you admitted to in your own case . . . do you understand that?

A:  Yes, sir.

Tr. at 21-24.

[7]     Defense counsel also pointed out that although D.W. testified he and M.S. went their separate ways after the incident with L.D., video showed them re-entering the school at the same time.  With regard to that video, defense counsel asked:

Q:  [Y]ou said earlier that after this incident happened that you described with [M.S.] doing this to [L.D.] that you and [M.S.] went your separate ways correct?

A:  Correct.

* * *

Q:  Are you saying the video is wrong because you and [M.S.] split up?

A:  The video ain't wrong because it's video. . . . When I got back there I was like walking in like from the side door.  I wasn't paying attention to nobody else.

* * *

Q: Okay so you don't, so you mentioned that the video doesn't like [sic] so you don't so it shows you and [M.S.] walking in together so that's what happened, right?

A: Right. Right.

Q: Okay. So basically what you said . . .

(Phone Ringing)

[Defense counsel]: Sorry, Judge, I apologize.

Q: Just to make sure we are clear, what you said a couple weeks ago as part of your admission on this case was not true?

A: No, sir.

Q: So what you said here under oath about what you did is not true but what you are saying here today under oath about what [M.S.] did and the Court should believe it, is that what you are saying?

A: Sort of.

Q: Sort of.

* * *

A: I don't pay attention to other people. I pay attention to myself. Because teachers are always telling me don't worry about that person. Worry about yourself.

Tr. at 25-28. On redirect, the State asked D.W.:

Q: You gave uh the statement, your pre-trial conference that [M.S.] took the money from the kid right?

A: Yes, ma'am.

Q: Alright and that portion is entirely consistent with what you have told us here today, is that correct?

A: Yes, ma'am.

Tr. at 28. Two IPSPD officers also testified; L.D. did not.[2] Neither IPSPD officer witnessed the incident. Officer Gaines testified that he saw M.S. and D.W. return to the school together on the afternoon of December 4 and that L.D. later approached him and said two kids had taken his money. From L.D.'s description, Officer Gaines recognized M.S. and D.W. Officer Percy Johnson was involved in the school's investigation the following day.

[8] At the close of the State's evidence, M.S. moved for a Trial Rule 41(B) dismissal arguing that the State had failed to prove its case beyond a reasonable doubt, primarily because D.W. was not a credible witness. The juvenile court denied the motion. M.S. then rested his case without presenting any evidence and made a brief closing argument again alleging that D.W. was not a believable witness and that a "not true finding is not only appropriate but necessary here." Tr. at 58. The juvenile court, having "reviewed the exhibit's [sic] and evaluated the credibility of the witnesses," entered a true finding for robbery and set the case for a dispositional hearing. *Id.*

[9] Prior to the dispositional hearing, M.S.'s counsel reviewed the audio from D.W.'s admission hearing and then filed a Motion for Reconsideration of True Finding. In that motion, M.S. again asserted that D.W.'s testimony was inconsistent and therefore not credible, and further asserted that the State had "failed to disclose the impeaching fact that [D.W.] had admitted to pushing

---

[2] L.D.'s family had apparently moved out of state shortly after the incident.

[L.D.] around during his factual basis for his plea" and "active[ly] misrepresent[ed]" D.W.'s testimony at his admission hearing "by arguing that there was no real inconsistency since [D.W.] had said during his plea that only [M.S.] interacted with [L.D.]." Appellant's Appendix at 54. At the dispositional hearing, M.S.'s counsel noted that the same prosecutor had represented the State in both D.W.'s and M.S.'s cases and

> [t]here was no disclosure to myself who was not here for [D.W.'s] plea hearing that hey he says something different in this Court under oath when he did [the] plea. He said he did push the kid around. And you know we need to know that as part of their duty to provide exculpatory information.

Tr. at 64. The juvenile court denied the motion to reconsider and ordered M.S. placed on probation with a suspended commitment to the Indiana Department of Correction. M.S. now appeals.

# Discussion and Decision

## I. Sufficiency of the Evidence

### A. Standard of Review

Generally, when we review the sufficiency of the evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not "assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction." *Id*. Rather, convictions should be affirmed unless "no reasonable fact-finder could find the elements of the crime proven

beyond a reasonable doubt." *Id.* at 146-47 (quoting *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000)).

[11] M.S. has raised a particular kind of insufficiency of evidence claim: he contends that the testimony on which his conviction is based is incredibly dubious. The incredible dubiosity rule allows a reviewing court to impinge on the fact-finder's responsibility to judge the credibility of the witnesses in limited circumstances. *Tillman v. State*, 642 N.E.2d 221, 223 (Ind. 1994). Our supreme court has recently re-examined the incredible dubiosity rule and set forth the appropriate scope of the rule. *Moore v. State*, 27 N.E.3d 749 (Ind. 2015). In order to apply the rule, there must be: "1) a sole testifying witness; 2) testimony that is inherently contradictory, equivocal, or the result of coercion; and 3) a complete absence of circumstantial evidence." *Id.* at 756.

## B. D.W.'s Testimony

[12] M.S. claims D.W.'s "incredibly dubious testimony is insufficient to prove M.S. committed robbery beyond a reasonable doubt," Brief of Appellant at 6, citing D.W.'s inherently contradictory testimony at his own admission hearing, that D.W.'s testimony at M.S.'s fact-finding hearing contradicted his testimony at his admission hearing, and D.W.'s inherently contradictory testimony at M.S.'s fact-finding hearing.

[13] The application of the rule requires *trial testimony* that is inherently improbable, contradictory, or coerced. *Buckner v. State*, 857 N.E.2d 1011, 1018 (Ind. Ct. App. 2006); *see also Murray v. State*, 761 N.E.2d 406, 409 (Ind. 2002) (noting that

a witness's trial testimony was not incredibly dubious even where it was inconsistent with a pre-trial statement, because "it was not equivocal and [the witness] *did not contradict himself on the witness stand.*") (emphasis added). It is true that D.W.'s testimony at his admission hearing was contradictory, as he first testified he did not touch L.D. and then admitted that he did. It is also true that some of D.W.'s testimony at his admission hearing contradicted his testimony at M.S.'s fact-finding hearing, as he agreed he touched L.D. at his admission hearing and denied that he touched L.D. at M.S.'s fact-finding hearing. However, the incredible dubiosity rule does not apply to the extent M.S.'s argument relies upon consideration of statements D.W. made outside of M.S.'s fact-finding hearing.

[14] That leaves only consideration of whether D.W.'s testimony about M.S.'s conduct at M.S.'s fact-finding hearing was inherently contradictory or equivocal.[3] M.S. asserts that it was, pointing to the following two exchanges on cross-examination:

> Q: And part of that plea agreement was agreeing to testify against [M.S.] saying that he did this to [L.D.] correct? . . . And did you also agree to that because you just want this to be over?
>
> A: No, he that's what really happened.

Tr. at 23-24.

_____

[3] Despite noting D.W.'s admission agreement was conditioned on his giving testimony at M.S.'s fact-finding hearing, M.S. does not allege D.W.'s testimony was the result of coercion.

Q: So what you said here under oath about what you did is not true but what you are saying here today under oath about what [M.S.] did and the Court should believe it, is that what you are saying?

A: Sort of. . . . I don't pay attention to other people. I pay attention to myself. Because teachers are always telling me don't worry about that person. Worry about yourself.

*Id.* at 27-28. M.S. interprets D.W.'s answer "sort of" to be equivocal testimony about M.S.'s role in the robbery that contradicts his affirmative assertion that "what really happened" was M.S. robbed L.D. However, from the context of the entire second exchange, *see* ¶ 7, *supra*, the State's interpretation is more plausible: the question "[s]o what you said here under oath about what you did is not true," was referring to D.W.'s testimony about whether or not he returned to the school with M.S., and D.W.'s answer "[s]ort of," was explaining that he did not know that he had re-entered the school at the same time as M.S. because he was not paying attention to the other people around him. We cannot say that D.W.'s testimony on this point was equivocal or inherently contradictory.

[15] All three factors set forth in *Moore* must be present to warrant application of the incredible dubiosity rule. Because at least one of them— testimony that is inherently contradictory, equivocal, or the result of coercion—is not present here, the rule is not applicable. Instead, this is a classic example of a simple request for us to reweigh the evidence and find in M.S.'s favor. D.W.'s inconsistent statements concern only his own conduct, and although they certainly bear on his credibility and the weight to be accorded his testimony, the juvenile court specifically found his testimony about M.S.'s conduct to be

credible. Had we been the fact-finders, we might have reached a different conclusion. But in accordance with our standard of reviewing sufficiency claims, we must credit D.W.'s testimony that M.S. threatened L.D. and took his wallet. We therefore hold there is sufficient evidence to prove beyond a reasonable doubt that M.S. knowingly or intentionally took property from L.D. by threatening the use of force. *See* Ind. Code § 35-42-5-1.

## II. *Brady* Claim

### A. Standard of Review

[16] In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "To prevail on a *Brady* claim, a defendant must establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *Minnick v. State*, 698 N.E.2d 745, 755 (Ind. 1998) (citing *Brady*, 373 U.S. at 87), *cert. denied*, 528 U.S. 1006 (1999). "Favorable evidence" includes both exculpatory evidence and impeachment evidence. *See Prewitt v. State*, 819 N.E.2d 393, 401 (Ind. Ct. App. 2004), *trans. denied*. Evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The State will not be found to

have suppressed material evidence if it was available to the defendant through the exercise of reasonable diligence. *Denney v. State*, 695 N.E.2d 90, 95 (Ind. 1998). Suppression of *Brady* evidence is a constitutional error warranting a new trial. *Turney v. State*, 759 N.E.2d 671, 675 (Ind. Ct. App. 2001), *trans. denied*.

## B. Evidence of D.W.'s Admission Hearing

[17] M.S. contends the State violated its duty under *Brady* to disclose material evidence when it "suppressed the fact of D.W.'s contradictory testimony from his admission hearing during M.S.'s trial." Brief of Appellant at 19.

[18] The same deputy prosecuting attorney represented the State at both D.W.'s admission hearing and M.S.'s fact-finding hearing. M.S. contends that she therefore knew of D.W.'s inconsistent testimony during his admission hearing and knew that his admission hearing testimony contradicted some of the testimony he gave at M.S.'s fact-finding hearing. Because she did not disclose this to M.S., M.S. asserts the State suppressed evidence M.S. could have used for impeachment of the only eyewitness to testify to the crime. However, going in to the fact-finding hearing, M.S. knew the substance of D.W.'s admission hearing testimony, if not the particulars. He knew D.W. had admitted to committing battery and criminal conversion and that he contradicted that admission by denying at the fact-finding hearing that he had touched L.D. or taken his money. He vigorously cross-examined D.W. on these inconsistencies. In addition, although M.S.'s counsel did not listen to the audio from D.W.'s admission hearing until after his own fact-finding hearing, he has not shown

that he was unable to do so prior to the fact-finding hearing. In fact, he referenced a statement D.W. had given to the probation department, which implies he had looked into D.W.'s case prior to M.S.'s fact-finding hearing. Therefore, we cannot say the State suppressed any evidence that M.S. did not already have or, in the exercise of reasonable diligence, could not have discovered for himself.

[19] Even assuming, as M.S. argues, that the State failed to disclose the full extent of D.W.'s inconsistent testimony, to prevail on a *Brady* claim, M.S. must show that the evidence in question was material to an issue at trial such that there is a reasonable probability the outcome would have been different had the evidence been disclosed. *McKnight v. State*, 1 N.E.3d 193, 207 (Ind. Ct. App. 2013). As the sole eyewitness, D.W.'s credibility was central to the State's ability to prove its case against M.S. However, M.S. highlighted the issues with D.W.'s credibility in his cross-examination, specifically getting D.W. to admit that he had previously lied under oath about his own conduct and challenging him as to why the court should believe him about M.S.'s conduct. In light of all the evidence at the fact-finding hearing, the impeaching value of *additional* inconsistencies in D.W.'s testimony was negligible, at best, especially since none of those inconsistencies regarded M.S.'s conduct. Rather, D.W. consistently testified that M.S. had threatened L.D. and taken his money. The issue of D.W.'s credibility was squarely before the juvenile court, and the juvenile court resolved it in favor of believing D.W. Under these circumstances, M.S. has not shown a reasonable probability that the outcome

of his fact-finding hearing would have been different if his trial counsel had known the full substance of D.W.'s admission hearing testimony and attempted to impeach him with questions about additional inconsistencies. Accordingly, we conclude there was no *Brady* violation.[4]

# Conclusion

[20] The incredible dubiosity rule does not apply to this case, as a sole witness did not provide inherently improbable testimony in the complete absence of circumstantial evidence, and the evidence was otherwise sufficient to support the true finding against M.S. M.S. also did not prove a *Brady* violation with regard to evidence of D.W.'s admission hearing testimony. Accordingly, the juvenile court's adjudication of M.S. as a delinquent child for committing robbery, a Class C felony if committed by an adult, is affirmed.

[21] Affirmed.

Bailey, J., and Brown, J., concur.

---

[4] After briefing was complete in this case, M.S. filed a Notice of Additional Authority pointing out *Smith v. State*, 22 N.E.3d 620 (Ind. Ct. App. 2014). *Smith* addressed the State's knowing proffer of perjured testimony, which is not a specific claim M.S. has made in this appeal and it is therefore not directly on point. In addition, the Indiana Supreme Court has heard oral argument on the case and a transfer petition remains pending.