## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 08 2020, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Cynthia M. Carter
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

State of Indiana,

*Appellant-Respondent,*

v.

Donald L. Worth,

*Appellee-Petitioner.*

September 8, 2020

Court of Appeals Case No.
19A-PC-2066

Appeal from the Marion Superior Court

The Honorable Barbara Crawford, Judge

The Honorable Steven Rubick, Magistrate

Trial Court Cause No.
49G01-1502-PC-5388

**Altice, Judge.**

# Case Summary

[1] The State appeals the grant of post-conviction relief in favor of Donald Worth, claiming that the trial court erred in determining that the State had failed to disclose certain medical records prior to trial. Specifically, the State contends that the evidence failed to show that it had violated the exculpatory evidence rule announced in *Brady v. Maryland,* 373 U.S. 83 (1963).

[2] We reverse and remand.

# Facts and Procedural History

[3] The facts, as reported in Worth's direct appeal, are as follows:

> On December 28, 2012, K.S. lived with Michelle Robinson (Robinson), her Narcotics Anonymous sponsor, in Indianapolis, Indiana. That afternoon, K.S. left the apartment with a male friend to go to the grocery store. They had a couple of drinks before K.S. returned to Robinson's apartment. While there, K.S. contacted Worth and asked him to pick her up so they could go to a bar. K.S. had known Worth approximately six months and referred to him as "Teddy Bean." (Transcript p. 194). Robinson did not "get a good feeling about [Worth]" so K.S. told her that she was going to be picked up by her brother. (Tr. p. 195). After leaving the apartment, K.S. and Worth went to Mike's Speedway Lounge, where they consumed several alcoholic beverages. After Worth paid the bill, K.S. and Worth went to Worth's apartment

"right around the corner" because he was "too drunk" to drive K.S. back to Robinson's apartment. (Tr. p. 197). K.S. fell asleep on the couch while Worth slept in his bed.

The next morning, at approximately 11:00 a.m., K.S. and Worth purchased food from a McDonald's restaurant and vodka from a liquor store. They returned to Worth's apartment where they ate, drank, and watched television for several hours. K.S. asked if they could get something more to eat "to soak up the alcohol in our stomach," but Worth refused. (Tr. p. 202). When K.S. again asked Worth to get something to eat, Worth became "irritated" and "things just turned violent." (Tr. p. 204). Worth hit K.S. in the left eye with his "closed fist" and then wrapped his hand around K.S.'s hair and threw her to the ground. (Tr. p. 205). K.S. curled herself into a ball on the floor while Worth repeatedly kicked her in the face with his work boots, yelling . . . at her. . . . K.S. lost consciousness. When she awoke, she was in Worth's bed. Her pants had been removed and Worth was on top of her with his penis in her vagina. K.S. screamed "to get the f- - k off [her]." (Tr. p. 208). Worth hit K.S.'s head against the wall while yelling profanities. She drifted in and out of consciousness as Worth continued to have intercourse with her.

When they both awoke the following morning, K.S. told Worth, "You beat the crap out of me," but Worth denied this and instead told K.S., "you were drunk. You were falling all over the place." (Tr. pp. 211-12). Worth told K.S. to call Robinson and tell Robinson that "Worth didn't beat [her] up." (Tr. p. 213). K.S. called but was unable to give Robinson Worth's address because he refused to give K.S. this information. After the phone call, Worth and Robinson [sic] returned to Mike's Speedway Lounge where the bartender observed that K.S.'s whole entire face was swollen "like a softball" and her injuries were "very noticeable." (Tr. pp. 304, 317). K.S. repeated several times, "he did not do this to me. He is a very nice man." (Tr. p. 305). Eventually, K.S. called Robinson from the bar to pick her up.

When Robinson arrived, she noticed that K.S. looked "scared" and her "face was disfigured." (Tr. p. 270). Robinson immediately took K.S. to Methodist Hospital.

At Methodist, Joyce Fuss (Nurse Fuss), a registered nurse and forensic nurse examiner, documented K.S.'s injuries, which included a softball-sized swelling to the left cheek, bruising under K.S.'s left eye, a round bruise to the left of K.S.'s trachea, and bruising to K.S.'s knees. Nurse Fuss also observed a laceration to K.S.'s vagina that required stitches, as well as vaginal abrasions indicative of a sexual assault. Nurse Fuss also collected a blood standard and swabs from K.S., as well as from her blue jeans. Subsequently, K.S. had to undergo surgery to drain the blood and fluids from the hematoma and a dental procedure to shave the bone underneath her gums.

Officer Laura Smith of the Indianapolis Metropolitan Police Department (Officer Smith) met K.S. at the Methodist emergency room and gathered information about Worth. When Officer Smith, together with other officers, met Worth at his apartment, Worth yelled [at them] . . . and had to be assisted to the patrol car. (Tr. p. 636). He was transported to Officer Smith's office in handcuffs. During two searches of Worth's apartment, officers collected a bed sheet off Worth's bed, a bloody washcloth, Worth's work boots, his cell phone, and K.S.'s cell phone.

*Worth v. State*, No. 49A02-1312-CR-1065, *slip op.* at 1-5 (Ind. Ct. App. Oct. 2, 2014), *trans. denied.*

[4] On January 2, 2013, the State charged Worth with rape, a Class A felony; rape, a Class B felony; battery, a Class C felony; battery, a Class A misdemeanor; and two counts of criminal confinement, a Class D felony. Prior to trial, the State

filed eight notices of discovery compliance from January through September 2013. The State's first notice also notified Worth of its open file policy that allowed defense attorneys of record to review the prosecutor's file by appointment during the pendency of the case. The "open file" included all information, excluding "work product." *Direct Appeal Appendix* at 47. On February 5, 2013, the State provided several documents to Worth including "medical records of [K.S.], 12 pages," and on February 14, 2013, the State provided Worth with a copy of K.S.'s January 1, 2013, thirty-page taped statement. *Id.* at 50, 52.

[5] On May 9, 2013, the State sought K.S.'s medical and dental records from Amazing Family Dentistry (AFD) and IU Health Indiana University Hospital School of Dentistry (IU). The State requested copies "of all treatment records . . . of patient [K.S.] . . . for treatment records beginning on or about December 2012/January 2013 to the present for treatment of injuries received on December 30, 2012" from AFD. *Id.* at 58. The State's request to IU sought "copies of all treatment records, including but not limited to x-rays and photographs . . . from . . . IU . . . and/or any specialty areas of medicine which provided consultation or otherwise participated in the dental/facial treatment of patient [K.S.] . . . for treatment dates beginning on or after December 30, 2012 to the present." *Id.* at 61-62. Over a month after it had issued these requests, and five months before Worth's trial commenced, the State filed notices of discovery compliance on June 25, 2013 and June 28, 2013. One of those

notices specifically stated that it "provided defense counsel" with the "certified medical records of [K.S.], 109 page(s)." *Id.* at 74.

[6] At some point during Worth's three-day jury trial that commenced on November 20, 2013, K.S. testified that she suffered from neurofibromatosis, a pre-existing medical condition, that caused small nodules or bumps to form on her skin. K.S. was shown six photographs of her face and other parts of her body. Four of these photographs were taken nine days after the attack. K.S. explained the images and distinguished between the injuries that Worth inflicted and those caused by her condition. One of the injuries she attributed to Worth's violent attack included a large hematoma on her left jaw.

[7] K.S. testified about the injuries she sustained in the attack as follows:

> Q: K.S., will you please tell us what injuries you suffered on December 29, 2012?
>
> A: I had my jaw, I had a huge hematoma in my jaw. I mean, it was out to here. I had a bone in the bottom of my mouth or my jaw broken from, I don't know, I don't know why. It was just broken underneath my gum line. I had tearing in my vagina, bruising around my neck, black eyes. . . . My knees were bruised. My elbows were bruised.

*Trial Transcript* at 220-21.

[8] K.S. also testified about her follow up medical treatments:

> I had to have surgery in my mouth. Because of the hematoma, they had to cut open the inside of my mouth and drain the huge hematoma out and put in a tube in my jaw to drain out the rest of

the blood and fluids, that my dentist had to grind down inside my mouth the broken down bone in there, and I had to have stitches put inside my torn vagina.

*Id.* at 222.

K.S. also identified one of the photographs taken after her examination at the hospital on December 30, 2013. K.S. explained that the photograph showed "the tube that they put in my mouth to drain the rest of the blood and fluids off from the hematoma." *Id.* at 230.

During cross-examination, Worth's counsel questioned K.S. about her jaw, as follows:

> Q: K.S., is it your testimony here today that you suffered a broken—a bone that was broken in your jaw?
>
> A: I didn't think I had a broken bone in my jaw. I had broken bone on my lower—
>
> Q: On your mouth?
>
> A: On my lower, yeah. But underneath my gums, I had broken bones that had to be shaved.

*Id.* at 251.

The AFD records showed that K.S. underwent multiple dental surgeries in December 2012, including the "removal of [an] erupted tooth . . . requiring removal of bone and/or section of tooth" and extraction [of] . . . exposed root.

. . ." *PCR Appendix Vol. II* at 42-43, 49. Worth's line of defense was that K.S. was so intoxicated on the night of the incident that she fell and injured herself and the injuries she sustained in the fall were exacerbated by the neurofibromatosis. Hence, Worth asserted that K.S.'s recent dental surgery, coupled with her falls and neurofibromatosis, rendered her trial testimony untruthful and provided an alternative and probable explanation for her injuries.

[12] The jury found Worth guilty as charged on November 20, 2013. He was subsequently sentenced to an executed aggregate term of incarceration of fifty years in the Indiana Department of Correction.[1]

[13] Worth appealed to this court and we affirmed his convictions and sentence in all respects.[2] *Worth, slip op.* at 13-14. Thereafter, on March 2, 2015, Worth filed a pro se petition for post-conviction relief, alleging ineffective assistance of both trial and appellate counsel. Worth claimed that his attorneys were ineffective for failing to: a) adequately prepare for trial; b) challenge the presentation of false testimony; c) properly cross-examine the State's witnesses;

---

[1] At sentencing, the trial court merged the convictions for rape, a class B felony, one count of criminal confinement, a Class D felony, and battery, a Class C felony, into the Class A felony rape count.

[2] Worth argued on direct appeal that the trial court abused its discretion in excluding certain DNA evidence and in replacing one of the jurors. Judge Crone wrote separately and concurred in result as to the exclusion of the DNA evidence.

and d) raise a meritorious issue on appeal. Worth also alleged the existence of newly discovered evidence and while discussing the facts supporting that claim, he mentioned that the State suppressed favorable exculpatory or impeaching evidence. Worth, however, neither described nor identified that alleged evidence.

[14] Worth amended his petition on two occasions, claiming that his trial counsel had been ineffective for failing to independently obtain K.S.'s medical and dental records and using them to assist the defense.

[15] Prior to the post-conviction hearing that commenced on January 16, 2018, Worth submitted an affidavit from the Public Defender Agency, stating that his case file contained neither IU nor AFD records. Worth asserted that "the jury was left in the dark concerning the intervening invasive procedures" between December 29, 2012 and the photographs that were taken on January 8, 2013. *PCR Appendix Vol. II* at 150.

[16] At the hearing, one of Worth's trial attorneys testified that she "did not remember [receiving K.S.'s dental records]" prior to trial. *PCR Transcript* at 44. She and co-counsel also testified that those records were not in Worth's case file when they were preparing for the post-conviction hearing. Worth's counsel acknowledged that she would have submitted K.S.'s dental records at trial, had they established an "alternate reason" for K.S.'s injuries. *PCR Transcript Vol. II* at 67-69.

[17]     Following the presentation of evidence, the post-conviction court granted

Worth's request for relief on June 12, 2019, and entered the following findings

of fact and conclusions of law:

> 5. At the hearings, Defendant presented testimony from his trial counsels and his appellate counsel as well as . . . the forensic nurse who worked with the victim after she was treated at the hospital. Additionally, Defendant admitted the record of proceedings and certain medical records.
>
> 6. Trial counsel testified that they were not provided certain dental records of the victim that were later determined to have been in possession of the State. This issue is dispositive.
>
> CONCLUSIONS OF LAW
>
> Although Defendant elected at the hearing to address his claims of ineffective assistance of counsel, the inability of his attorneys to obtain and introduce certain evidence at trial necessarily limited their effectiveness. Attorney Kathie Perry testified that certain dental records in the possession of the State would have been used to corroborate the defense theory regarding the nature and cause of the victim's injuries; specifically, the victim suffered from neurofibromatosis and had ongoing dental work, which provided an alternate explanation for the extent of her injuries. Perry stated the defense would have used the dental records had they received them in discovery and there was no strategic reason for not using them. The dental records in question were not contained in the public defender's file nor are they noted in the State's several notices of discovery compliance.
>
> Defendant argues he received ineffective assistance due to his counsel's failure to investigate and obtain these dental and medical records and admit them as trial exhibits. Defendant's

argument on this point aims at the wrong target. The State was in possession of the records in question but chose not to provide them to defense counsel. When a post-conviction claim is premised on counsel's alleged failure to conduct discovery, trial counsel cannot be found to have performed deficiently by simply identifying potential items of discovery. *See e.g., Williams v. State*, 724 N.E.2d 1070, 1076 (Ind. 2000). Here, Defendant has identified the missing discovery items and explained how those items could and would have been used. Defendant has clearly demonstrated how he was prejudiced by the absence of this information, he simply blames the wrong attorney in so doing. The deputy prosecutor withheld evidence and as a result denied Defendant a fair trial. Although the Defendant did not argue prosecutorial misconduct at the evidentiary hearing, the State cannot benefit from Defendant's misdirected focus.

This Court will not elevate form over function in this matter. Defendant was denied discovery by the State and, by extension, denied a full and fair trial on the merits. The Court finds Defendant has carried his burden and the law is in his favor. As such, the convictions entered herein and the sentence subsequently imposed must be vacated.

*PCR Appendix Vol. II* at 27-30. The State now appeals.

# Discussion and Decision

## I. Standard of Review

[18] Where, as here, the State appeals a judgment granting post-conviction relief, our standard of review is that in accordance with Indiana Trial Rule 52(A). *State v. Oney,* 993 N.E.2d 157, 161 (Ind. 2013).

On appeal of claims tried by the court without a jury or with an advisory jury, at law or in equity, the court on appeal shall not

> set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses.

*Id.* Under the clearly erroneous standard of review, we review only for the sufficiency of the evidence. *Id.* We neither reweigh the evidence nor determine the credibility of witnesses. *Id.* We consider only the probative evidence and reasonable inferences supporting the judgment and reverse only on a showing of clear error. *Id.* Clear error is "that which leaves us with a definite and firm conviction that a mistake has been made." *Id.* We do not defer to the post-conviction court's legal conclusions. *Humphrey v. State,* 73 N.E.3d 677, 681 (Ind. 2014).

## II. The State's Contentions

[19]  The State argues that the post-conviction court "clearly erred in vacating Worth's convictions under *Brady* [*v. Maryland*]." *Appellant's Brief* at 26. The State contends that the evidence failed to show that it had suppressed any evidence, and that K.S.'s dental and medical records "were not material to the verdict." *Id.*

[20]  In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

"To prevail on a *Brady* claim, a defendant must establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *Minnick v. State*, 698 N.E.2d 745, 755 (Ind. 1998); *Hyppolite v. State,* 774 N.E.2d 584, 599 (Ind. Ct. App. 2002). "Favorable evidence" includes both exculpatory evidence and impeachment evidence. *Prewitt v. State,* 819 N.E.2d 393, 401 (Ind. Ct. App. 2004), *trans. denied.* Evidence is "material" under *Brady* "only if there is a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Hayden v. State,* 830 N.E.2d 923, 930-31 (Ind. Ct. App. 2005) (emphasis added), *trans. denied.* A "'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682 (1985).

[21] Additionally, the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "'materiality' in the constitutional sense" required in accordance with *Brady*. *United States v. Agurs*, 427 U.S. 97, 109-110 (1976). And the State will not be found to have suppressed material evidence if it was available to a defendant through the exercise of reasonable diligence. *Conner v. State,* 711 N.E.2d 1238, 1246 (Ind. 1999), *cert. denied*, 531 U.S. 829 (2000). Suppression of *Brady* evidence is constitutional error warranting a new trial. *Turney v. State,* 759 N.E.2d 671, 675 (Ind. Ct. App. 2001), *trans. denied.*

[22] As noted above, Worth's trial counsel testified at the post-conviction hearing that she could not recall receiving K.S.'s dental records from AFD and IU

during the discovery process and "they were not in [the] file" when they were preparing for the hearing. *PCR Transcript Vol. II* at 34. An affidavit from the public defender's office averred that at some time on or after December 1, 2017, a paralegal from that office examined trial counsel's case file and did not find records from IU or AFD.

[23] Neither the affidavit nor trial counsels' testimony provide a basis for the post-conviction court's conclusion that K.S.'s records were "not provided" and the State "chose not to provide them to defense counsel." *PCR Appendix Vol. III* at 27, 29. Rather, the post-conviction court's conclusion rests on the bare assumption that the contents of Worth's file—several years after he was tried—were identical to the contents of the file at the time of trial. Trial counsels' testimony and affidavit established only what had been viewed in Worth's case file in preparation for the post-conviction hearing. It was error for the post-conviction court to conclude, based on the evidence presented, that the State received and chose to withhold K.S.'s medical and dental records from Worth.

[24] We also note that with respect to the materiality requirement under *Brady*, the dental records from IU show that several of K.S.'s decayed teeth were removed in 2011. Upon K.S.'s return to IU in January 2013, she reported the "assault resulting in [the] facial hematoma" and underwent surgery to "bluntly dissect into large hematoma and area was massaged with copious amounts of clotted blood being removed." *Exhibit* 11 at 16.

[25] AFD's records establish that K.S. was treated from June 2012 through the end of January 2013. Prior to the incident, K.S. had several teeth extracted and she was fitted for dentures. When K.S. returned to AFD on January 10, 2013, AFD's staff noticed "very visible bruises and marks around [K.S.'s] neck and massive swelling in both jaws" that appeared "to be caused by some type of string or cord that was forcibly applied around her neck." *Exhibit* 6 at 6. K.S. told AFD personnel that "her boyfriend beat and tried to strangle [her]." *Id.* AFD's records stated that "the swelling on the left side," of K.S.'s jaw was very "pronounced and extended. . . ." *Id.* The dentist at AFD offered to delay further treatment until K.S. was "feeling better from the trauma she received." *Id.* AFD's records reflected that the discussions with K.S. took place only a week after the attack.

[26] The dental and medical records from IU and AFD do not support a reasonable probability that the outcome of Worth's trial would have been different if, in fact, Worth had them prior to trial. In addition to K.S.'s own testimony, multiple witnesses, including police officers, doctors, and nurses, testified about the injuries that K.S. sustained during the attack on December 29, 2012. Moreover, the hematoma and its connection to the incident is documented by both IU and AFD records.

[27] The documentation in K.S.'s dental and medical records from IU and AFD suggest nothing more than a "mere possibility" that K.S.'s injuries might have been caused by anything other than Worth's attack. Nothing in those records contradicts the evidence at trial. Thus, in addition to the lack of evidence

supporting the post-conviction court's determination that the State suppressed the IU and AFD records, Worth also failed to establish *Brady's* materiality requirement. For these reasons, the post-conviction court erred in determining that the State violated the exculpatory evidence rule in *Brady*, and Worth is not entitled to relief on this basis.

[28] Although Worth cannot prevail under his *Brady* claim, the post-conviction court made no findings with regard to Worth's ineffective assistance of counsel allegations. Therefore, we remand this cause to the trial court with instructions to enter findings of fact and conclusions of law as to those contentions.

[29] Reversed and remanded.

Bailey, J. and Crone, J., concur.